UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ISAAC KWASI ACHEAMPONG,

                          Plaintiff,

                                                    **MEMORANDUM & ORDER**
                - against -                          20-CV-3293 (PKC)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Isaac Kwasi Acheampong brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision made by the Commissioner of the Social Security Administration ("SSA") denying his claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). The Commissioner moved for judgment on the pleadings on February 16, 2021. (Dkt. 10.) Plaintiff did not respond to the Commissioner's motion. (*See* 4/30/2021 Docket Order (*sua sponte* extending the deadline for Plaintiff to respond).) For the reasons set forth below, the Court denies the Commissioner's motion for judgment on the pleadings. The case is remanded for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

### I.    Procedural History

On December 11, 2018, Plaintiff filed an application for DIB and SSI, claiming that he had been disabled due to diabetes, chronic low back pain, incontinence,[1] allergic rhinitis, prostate

---

[1] Although Plaintiff wrote "[i]ncompetent" on his application form (Tr. 75–76), read in context, this is clearly a typographical error and the Court assumes that Plaintiff intended to write "incontinence."

issues ("unable to hold my bladder"), and high cholesterol since October 15, 2016. (Tr.[2] 10, 75–76, 251.) The claim was initially denied on March 12, 2019. (Tr. 119–21.) After the claim was denied, Plaintiff requested and appeared with counsel for a hearing before administrative law judge Ifeoma N. Iwuamadi (the "ALJ") on February 20, 2020. (Tr. 10, 18.) During the hearing, vocational expert Kentrell Pittman testified by telephone. (Tr. 10.) On March 18, 2020, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act") from his alleged onset date through the date of the decision. (Tr. 10–18.) Plaintiff's request for a review of the ALJ's decision was denied by the Appeals Council on June 11, 2020. (Tr. 1–4.) Thereafter, Plaintiff timely commenced this action.[3]

## II.   The ALJ's Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The plaintiff bears the burden of proof at the first four steps of the inquiry; the Commissioner bears the burden at the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted). First,

---

[2] All references to "Tr." refer to the consecutively paginated Administrative Transcript. (Dkt. 8.)

[3] According to Title 42, United States Code, Section 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard, the Court determines that Plaintiff received the Commissioner's final decision on June 16, 2020 (*i.e.*, five days after Plaintiff's request to appeal the ALJ's decision was denied on June 11, 2020) and that Plaintiff's filing of the instant action on July 16, 2020—30 days later—was timely. (*See generally* Complaint, Dkt. 1.)

the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the answer is yes, the plaintiff is not disabled. *Id.* If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is severe when it "significantly limit[s] [the plaintiff's] physical or mental ability to do basic work activities." *Id.* §§ 404.1522(a), 416.922(a). If the plaintiff does not suffer from an impairment or combination of impairments that is severe, then the plaintiff is not disabled. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). But if the plaintiff does suffer from an impairment or combination of impairments that is severe, then the ALJ proceeds to the third step and considers whether it meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see also id.* pt. 404, subpt. P, app. 1. If the ALJ determines at step three that the plaintiff has one of the listed impairments, then the ALJ will find that the plaintiff is disabled under the Act. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). On the other hand, if the plaintiff does not have a listed impairment, the ALJ must determine the plaintiff's residual functional capacity ("RFC") before continuing on to steps four and five. To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). The ALJ will then use the RFC finding in step four to determine if the plaintiff can perform past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the answer is yes, the plaintiff is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Otherwise, the ALJ will proceed to step five and determine whether the plaintiff, given their RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy.

*Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits.  *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

Here, at step one, the ALJ determined that Plaintiff met the insured status requirements of the SSA through September 30, 2018 and had not engaged in substantial gainful activity since the alleged onset date of October 15, 2016.  (Tr. 12.)  At step two, the ALJ determined that Plaintiff had the following severe impairments: diabetes mellitus, hyperlipidemia, and lumbar spine degeneration.  (*Id.*)  At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the listed impairments in the Listings.  (Tr. 12–13.)  The ALJ then determined Plaintiff's RFC as follows:

> [T]he [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[4] except the [Plaintiff] can occasionally climb ramps and stairs.  He cannot climb ladders, ropes or scaffolds and cannot be exposed to unprotected heights and moving mechanical parts.

(Tr. 13.)  Then, at step four, the ALJ concluded that Plaintiff is capable of performing past relevant work as a "case aide,"[5] which does not require the performance of work-related activities precluded by Plaintiff's RFC.  (Tr. 17.)  Thus, the ALJ found that Plaintiff was not disabled as defined by the SSA from October 15, 2016 through the date of the decision.  (Tr. 18.)

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b).

[5] As discussed *infra*, Plaintiff previously worked as a case aide at an agency called Little Flower Children and Family where he observed and facilitated visitation between children living in foster care and their parents.  (Tr. 63.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (alterations and internal quotation marks omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (citation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam).

> In the context of a Social Security benefits appeal, if a motion for judgment on the pleadings is opposed, the Court may not grant the unopposed motion based merely upon the opposing party's failure to respond; rather, the Court "must review the record and determine whether the moving party has established that the undisputed facts entitle it to judgment as a matter of law."

*Mitchell v. Berryhill*, No. 15-CV-6595 (PED), 2017 WL 2465175, at *6 (S.D.N.Y. June 7, 2017) (quoting *Martell v. Astrue,* No. 09-CV-1701, 2010 WL 4159383, *7 n.4 (S.D.N.Y. Oct. 20, 2010)); *see also Hoyle ex rel. L.M. v. Comm'r of Soc. Sec.*, No. 16-CV-6395 (PKC), 2018 WL 566444, at *1 (E.D.N.Y. Jan. 26, 2018) ("Where a motion for judgment on the pleadings is unopposed, 'the

5

court may not grant the motion by default . . . the moving party must still establish that the undisputed facts entitle him to a judgment as a matter of law.'" (quoting *McDowell v. Comm'r of Soc. Sec.*, No. 08-CV-1783 (NGG), 2010 WL 5026745, at *1 (E.D.N.Y. Dec. 3, 2010))).

## DISCUSSION

## I.   Standards for Considering Medical Source Opinions

Previously, the SSA followed the "treating physician rule," which required the agency to give controlling weight to a treating source's opinion so long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("With respect to the nature and severity of a claimant's impairment(s), the SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." (internal quotation marks, alterations, and citations omitted)).

The 2017 regulations changed this standard for applications filed "on or after March 27, 2017."  20 C.F.R. §§ 404.1520c, 416.920c.  Under the new regulations, the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  *Id.* §§ 404.1520c(a), 416.920c(a).  Instead, when evaluating the persuasiveness of medical opinions, the Commissioner will consider the following five factors: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the

SSA] disability program's policies and evidentiary requirements." *Id.* §§ 404.1520c(c), 416.920c(c).

In her determination or decision, the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." *Id.* §§ 404.1520c(b); 416.920c(b). The most "most important factors" in determining the persuasiveness of a medical source's medical opinions or prior administrative medical findings are the supportability and consistency factors. *Id.* §§ 404.1520c(b)(2); 416.920c(b)(2). With respect to supportability, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). As to consistency, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). While the ALJ "may, but [is] not required to, explain how [she] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). However, where an ALJ "find[s] that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported [according to §§ 404.1520c(c)(1), 416.920c(c)(1)] and consistent with the record [according to §§ 404.1520c(c)(2), 416.920c(c)(2)] but are not exactly

the same," the ALJ is required to "articulate how [she] considered the other most persuasive

factors" for those opinions or findings.  *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3).

> Even though ALJs are no longer directed to afford controlling weight to treating
> source opinions—no matter how well supported and consistent with the record they
> may be—the regulations still recognize the "foundational nature" of the
> observations of treating sources, and "consistency with those observations is a
> factor in determining the value of any [treating source's] opinion."

*Shawn H. v. Comm'r of Soc. Sec.*, No. 19-CV-113 (JMC), 2020 WL 3969879, at *6 (D. Vt. July

14, 2020) (alteration in original) (quoting *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018));

*see also Brian O. v. Comm'r of Soc. Sec.*, No. 19-CV-983 (ATB), 2020 WL 3077009, at *4

(N.D.N.Y. June 10, 2020) (noting that, notwithstanding the "eliminat[ion of] the perceived

hierarchy of medical sources," the two most important factors of consistency and supportability

"are the 'same factors' that formed the foundation of the treating source rule" (quoting Revisions

to Rules, 82 Fed. Reg. 5844-01, at 5853)); *Barrett*, 906 F.3d at 343 ("[Examining physicians']

observations about an applicant's mental and physical condition are the first building block in the

disability determination.  They are the primary source that medical consultants and vocational

experts use to form their opinions.").  Because a treating source examines a claimant directly, they

"may have a better understanding of [a claimant's] impairment(s) . . . than if the medical source

only reviews evidence in [a claimant's] folder."   20 C.F.R. §§ 404.1520c(c)(3)(v),

416.920c(c)(3)(v); *see also Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006)

(noting in the context of the treating physician rule that "a physician who has a long history with

a patient is better positioned to evaluate the patient's disability than a doctor who observes the

patient once" (citation omitted)).

## II.     The ALJ Failed to Explain Why the Treating Physician's Opinion Was Unpersuasive

The ALJ considered four medical opinions in determining Plaintiff's RFC: (1) the opinion of consultative examiner Dr. Lyudmila Trimba, which the ALJ found "persuasive" (Tr. 15); (2) the opinion of non-examining consultant Dr. "C Levit," which the ALJ found "only somewhat persuasive" (Tr. 15–16); (3) the opinion of non-examining consultant Dr. "G. Feldman," which the ALJ found "persuasive" (Tr. 16); and (4) the opinion of Plaintiff's treating physician Dr. Theresa Osei, which the ALJ did not find persuasive (Tr. 16–17).  In finding that Plaintiff was capable of light work, the ALJ relied principally on Dr. Trimba's and Dr. Feldman's opinions.

In her internal medicine examination report dated February 20, 2019, Dr. Trimba noted that Plaintiff reported "dull," "9/10" pain radiating from his neck to his right arm and from his low back to his left leg that was not present when he was sitting.  (Tr. 327.)  Dr. Trimba conducted a musculoskeletal exam that revealed decreased range of motion in Plaintiff's lumbar spine and full flexion and range in his cervical spine, however, Dr. Trimba noted that Plaintiff complained of pain while performing these range of motion exercises.  (Tr. 329.)  Dr. Trimba found that an x-ray of Plaintiff's lumbar spine showed "degenerative change."  (Tr. 329.)  Dr. Trimba opined that "there is no limitation in [Plaintiff's] ability to sit for a prolonged time," but that Plaintiff "has mild to moderate limitation in his ability to stand and walk for a prolonged time," has "mild to moderate limitations in his ability to climb steps, push, pull, or carry heavy objects," and that Plaintiff "should avoid frequent bending."  (Tr. 330.)  Although the ALJ found Dr. Trimba's opinion "persuasive," she "could not find anything in the record that was consistent" with Dr. Trimba's assessment that Plaintiff would have "mild limitations in his ability to walk for a prolonged time" because Plaintiff described improvement with treatment, received only "conservative and limited" treatment, and applied to be a caseworker in 2019.  (Tr. 15.)

The ALJ also found Dr. Feldman's opinion "persuasive" (Tr. 16), however, Dr. Feldman reached a different conclusion about Plaintiff's capacity to stand and walk. Dr. Feldman's opinion, which was based solely on his review of Plaintiff's medical records, stated that Plaintiff could "[s]tand and/or walk (with normal breaks)" a total of "[a]bout 6 hours in an 8-hour workday," had limitations in pushing and/or pulling with his right upper extremity due to cervical spine pain, and could "[o]ccasionally" climb, balance, stoop, kneel, crouch, and crawl. (Tr. 100–01.) In determining that Dr. Feldman's opinion was "persuasive," the ALJ noted that it was "consistent with the record except for the opinion that [Plaintiff] can occasionally climb [l]adders, ropes and scaffolds as the evidence of record indicates that [Plaintiff] cannot perform these functions." (Tr. 16.) Thus, where Dr. Trimba and Dr. Feldman's opinions diverged on the issue of Plaintiff's capacity to stand and walk during a workday, the ALJ concluded that Dr. Feldman's opinion is consistent with the record, while, for the reasons identified above, Dr. Trimba's opinion that Plaintiff faced "mild to moderate limitation" is not.

Although the ALJ's explanation of the persuasiveness of each medical opinion is cursory at best, the Court remands for further proceedings because the ALJ failed to explain her considerations regarding the supportability and consistency factors in finding the opinion of Plaintiff's treating physician, Dr. Osei, to be unpersuasive.

As background, in October 2016, Dr. Osei diagnosed Plaintiff with, among other things, "chronic low back pain without sciatica,[6] unspecified back pain laterally." (Tr. 337.) Although Plaintiff was "[n]egative for back pain and joint swelling" and he had a normal physical

---

[6] "Sciatica" refers to pain that radiates along the path of the sciatic nerve, which branches from the lower back through the hips and buttocks and down each leg. *See Sciatica*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/sciatica/symptoms-causes/syc-20377435 (last visited Sept. 29, 2021).

examination (Tr. 342–43), Dr. Osei prescribed him "neurontin[7] / robaxin[8]" to treat his chronic back pain.  (Tr. 344).  In April 2017, Dr. Osei again identified "chronic low back pain without sciatica" as one of Plaintiff's problems (Tr. 348) and noted Plaintiff's prescription for Neurontin to be taken "by mouth 3 (three) times a day" and for Robaxin to be taken "by mouth 2 (two) times a day as needed (back spasm)."  (Tr. 349).  In May 2017, Dr. Osei reported that Plaintiff was "negative for back pain," that his physical examination was normal, and that Plaintiff reported his "back pain + abnormal sensation" in his legs was "better."  (Tr. 361.)  Dr. Osei continued Plaintiff's treatment with Neurontin "by mouth nightly."  (Tr. 358, 363.)  In November 2017, Dr. Osei evaluated Plaintiff, noting, among other things, a generally normal review of systems and physical examination, but that Plaintiff's chronic back pain was "[s]till on & off," that he had "relief with Robaxin," and that he was "go[]ing to see [a] private ch[i]ropractor."[9]  (Tr. 374–75.)

More than a year later, in February 2019,[10] Plaintiff was evaluated by Dr. Osei for "back pain," "diabetes," and "urinary frequency."  (Tr. 379.)  He was again diagnosed with "chronic low back pain without sciatica, unspecified back pain laterally" (Tr. 379), his prescriptions for Robaxin and Neurontin were renewed (Tr. 388), and he was referred to Physical Medicine Rehab for physical therapy ("PT") (id.).  In April 2019, Dr. Osei evaluated Plaintiff and noted, among other

---

[7] "Neurontin," also known as Gabapentin, is a medication used to relieve pain.  *See Neurontin*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/epilepsy/expert-answers/neurontin-side-effects/faq-20057893 (last visited Sept. 29, 2021).

[8] "Robaxin," the brand name for Methocarbamol, is a muscle relaxer used to treat muscle pain and discomfort that is not chronic or long-lasting.  *See Methocarbamol (Robaxin)*, GOODRX, https://www.goodrx.com/methocarbamol/what-is (last visited Sept. 29, 2021).

[9] It does not appear that the administrative record contains any records from a chiropractor.

[10] Plaintiff explained that he did not follow up with Dr. Osei for more than one year because he was traveling.  (Tr. 386.)

things, that Plaintiff's review of systems and physical examination were normal (Tr. 421), that Plaintiff "[d]eclined PT," that his chronic low back pain was "better with warm compress" and "[t]opical analgesic[11]" at night, and that the "[p]ower tone" in his legs was "okay" (Tr. 423). Dr. Osei reordered Plaintiff's prescription for Neurontin to be taken "by mouth nightly." (Tr. 416.) In May 2019, Plaintiff had another visit with Dr. Osei who noted that his problems still included "[c]hronic low back pain without sciatica." (Tr. 437.)

On July 1, 2019, Dr. Osei completed a Medical Source Statement for Plaintiff stating that Plaintiff's right arm "[g]et's numb . . . after pulling or pushing," his "[l]ow back pain worsened by leg movements," his "[n]eck and lower back pains get[] worse and stiff with severe arm pain after standing for > 2 hr or sitting for more than 4–6 hrs," and that he is "[a]t times unable to get up and walk after prolonged sitting." (Tr. 578–80.) As such, Dr. Osei opined that Plaintiff should lift or carry 10 pounds occasionally and less than 10 pounds frequently; should stand and/or walk less than 2 hours, and sit less than about 6 hours, in an 8-hour workday; and is limited in his upper and lower extremities for pushing and/or pulling. (Tr. 577–78.) Dr. Osei also stated that "[w]alking up staircase makes [Plaintiff's] back pain worse. So [does] crouching, crawling or stooping. [He is] [o]ccasionally able to kneel but has difficulty standing from [a] kneeling position." (Tr. 578.) Accordingly, Dr. Osei opined that Plaintiff should never crouch, crawl, or stoop, but could occasionally climb,[12] balance, and kneel. (*Id.*) Dr. Osei further opined that Plaintiff "[g]ets numb [and] weakness especially [in his] right arm after prolonged reaching," so is "limited" in reaching

---

[11] "Analgesic," also known as painkillers, are medications that relieve different types of pain. *See Analegestic*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/drugs/21483-analgesics (last visited Sept. 29, 2021).

[12] Dr. Osei added that Plaintiff "[c]annot climb up without worsening of back and neck pain. However, [Plaintiff is] not afraid of height[s]." (Tr. 580.)

all directions.[13]  (Tr. 579.)  Finally, Dr. Osei opined that Plaintiff should have "limited" exposure

to dust and fumes, odors, chemicals, and gases, explaining that "[d]ust and humid environment

cause excessive ears and nose irritation and . . . allergy flare up."[14]  (Tr. 580.)

> The ALJ did not find Dr. Osei's opinion to be persuasive for the following reasons:
>
> [T]he claimant has engaged in noncompliance in his treatment for diabetes.  He does not follow restricted diet and [the] record mentions non-compliance with medication.  He also applied in 2019 to be a caseworker, but did not get the job due to lack of a reference.  This medical source statement has more limitations than the job requires.  In addition, there is limited treatment in the record for musculoskeletal condition and the claimant reports improvement.  This opinion mentions neck pain, but there is no cervical spine MRI/x-ray's [*sic*] in the record.

(Tr. 17.)  The ALJ's treatment of Dr. Osei's opinion and explanation of its un-persuasiveness is

inadequate and erroneous.  First and foremost, the ALJ did not explain how she considered the

supportability and consistency factors, as required by the new regulations.  *See* 20 C.F.R.

§§ 404.1520c(b)(2), 416.920c(b)(2).  To the extent the ALJ's finding that the record contains

"limited treatment" for musculoskeletal condition and "no cervical spine MRI/x-ray[]" could be

construed as relevant to the "supportability" analysis, *see* 20 C.F.R. §§ 404.1520c(c)(1),

416.920c(c)(1), this is an improper basis upon which to discount Dr. Osei's opinion because it

amounts to the ALJ imposing her view "that the severity of a physical impairment directly

correlates with the intrusiveness of the medical treatment ordered."[15]  *See Burgess*, 537 F.3d at

129 (quoting *Shaw v. Chater*, 221 F.3d 126, 134–35 (2d Cir. 2000)); *Jackson v. Berryhill*, No. 17-

---

[13] Dr. Osei indicated that Plaintiff is "unlimited" in handling, fingering, feeling, seeing, hearing, and speaking.  (Tr. 579.)

[14] Dr. Osei diagnosed Plaintiff with allergies.  (Tr. 355, 366, 379, 413.)

[15] It was likewise improper for the ALJ to discount Dr. Trimba's opinion that Plaintiff would have "mild limitations in his ability to walk for a prolonged time" because Plaintiff received only "conservative and limited" treatment.  (Tr. 15.)

CV-6268 (FPG), 2018 WL 3306193, at *6 (W.D.N.Y. July 5, 2018) ("The ALJ may not discount
a treating physician's opinion 'merely because [she] has recommended a conservative treatment
regimen.'" (quoting *Burgess*, 537 F.3d at 129)).

Dr. Osei's opinion is, in fact, supported by and consistent with other medical evidence in
the record.  The treatment record described above reflects that Dr. Osei consistently assessed
Plaintiff as presenting with chronic back pain at each of his appointments, prescribed Plaintiff a
pain killer and muscle relaxer, and referred Plaintiff for physical therapy.  Although Plaintiff
initially "[d]eclined PT" in April 2019 (Tr. 423), in December 2019 he was assessed for physical
and occupational therapy by Dr. "A. Young" based on diagnoses of chronic back pain and neck
pain (Tr. 50).  Dr. Young noted that Plaintiff "[w]as referred for low back pain and neck pain since
2001," and that his "low back pain radiates to his left leg and thigh with tingling" and "[t]he neck
pain radiates to the right arm with tingling" is "[e]xacerbated by walking and bending" and
"[i]mproves with rest."  (Tr. 53.)  Dr. Young noted that a "2001 MRI c spine shows c4/5 posterior
herniation impinging upon right lateral recess," that Plaintiff reported pain as "7/10," and that
Plaintiff was "walking slowly" and "seem[ed] to be in mild distress from pain."  (*Id.*)  Dr. Young
prescribed Plaintiff to continue physical and occupational therapy and take Gabapentin, Robaxin,
and Naproxen.[16]  (*Id.*)  Dr. Young also "[p]erformed [a] right subacromial injection[17]" and directed
follow-up with neurology and an MRI.  (*Id.*; Tr. 54 (appointments were scheduled for Plaintiff to

---

[16] "Naproxen" is a nonsteroidal anti-inflammatory drug used to treat symptoms of arthritis
such as inflammation, swelling, stiffness, and joint pain.  *See Naproxen*, MAYO CLINIC,
https://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820
(last visited Sept. 29, 2021).

[17] A "subacromial injection" involves injecting a mixture of anesthesia and anti-
inflammatory medication into the shoulder.  *See Subacromial Injection*, WEBSTER ORTHOPEDICS,
https://www.websterorthopedics.com/subacromial-injection.html (last visited Sept. 29, 2021).

14

meet with specialists in neurosurgery, primary care, physical medicine and rehabilitation, urology, and neurology); Tr. 65 (Plaintiff testified that he got an injection in his right shoulder which was "good for the first two weeks," but after that "not as good").)  On December 26, 2019, Plaintiff had an MRI of his cervical spine based on a history of "[r]adicular pain right arm" that revealed "disc disease at C3-4 through C5-6," "cord compression at C4-5 and C5-6," "foraminal stenosis[18] at C3-4 through C5-6," and "minimal C5-6 subluxation."[19]  (Tr. 24; *Id.* (noting that clinician was "notified about the multilevel likely chronic cord compression and foraminal stenosis and recommendation for short-term follow-up").)  On the same date, Plaintiff also had an MRI of his lumbar spine that revealed various "multilevel findings" including disc bulging and foraminal stenosis.  (Tr. 25–26.)

Critically, as the Commissioner notes in her motion, Dr. Young's treatment records and the results of the cervical and lumbar spine MRIs were not included in the evidence submitted to the ALJ.[20]  (*See* Memorandum of Law, Dkt. 10-1, at 16 (noting that Dr. Young's report "was sent only to the Appeals Council").)  However, these records were submitted as additional evidence to the Appeals Council.  (*See* Tr. 2.)  "Social Security regulations expressly authorize a claimant to submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision."  *Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 645 (2d Cir. 2020) (summary

---

[18] "Foraminal stenosis" refers to a condition in which the passage through which the spinal cord runs in the bones of the spine becomes clogged and can press on the nerves.  *See Foraminal Stenosis*, CEDARS SINAI, https://www.cedars-sinai.org/health-library/diseases-and-conditions/f/foraminal-stenosis.html (last visited Sept. 29, 2021).

[19] "Subluxation" refers to partial dislocation.  *See Subluxation*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/subluxation (last visited Sept. 29, 2021).

[20] It is not clear to the Court why these records were not included among the materials provided to the ALJ.

order) (quoting *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996)).  If the additional evidence "predates the ALJ's decision, the Appeals Council shall evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.'"  *Id.* (quotation marks and citations omitted); *see also* 20 C.F.R. § 404.970.

Here, the evidence related to Plaintiff's treatment by Dr. Young and the results of the MRIs predate the February 20, 2020 hearing and the ALJ's March 18, 2020 decision.  (Tr. 2 (noting that Plaintiff submitted "records from Northwell Health dated from December 1, 2019 to January 21, 2020 (35 pages)").)  The Appeals Council found that this evidence did not show a reasonable probability that it would change the outcome of the ALJ's decision.  (*Id.*)  The Court disagrees. The ALJ discounted Dr. Osei's opinion as to Plaintiffs' functional limitations based on back and neck pain, in part, because "there [wa]s no cervical spine MRI/x-ray" in the record.  (Tr. 17.)  The new evidence submitted to the Appeals Counsel includes the very type of MRI the ALJ identified as missing from the record, and notably reveals Plaintiff's "multilevel likely chronic cord compression and foraminal stenosis" (Tr. 24), as well as treatment notes from Dr. Young that further support and are consistent with Dr. Osei's opinion and Plaintiff's claim that he was disabled due to back pain.  "The Appeals Council erred by determining that the new records, combined with the records already submitted, would not have altered the outcome," *Blash*, 813 F. App'x at 645, specifically, there is a reasonable probability that this supplemental evidence would change the ALJ's assessment of Dr. Osei's opinion as unpersuasive and the determination that Plaintiff has the RFC to perform his prior work as a case aide.  *See Cameron v. Comm'r of Soc. Sec.*, —F. Supp. 3d—, No. 20-CV-2138 (BMC), 2021 WL 1700312, at *5 (E.D.N.Y. Apr. 29, 2021) ("A 'reasonable probability' . . . must mean that if the new evidence warrants consideration and is

16

accepted on remand, then a favorable award will obtain."). Thus, remand is necessary for the ALJ to consider the evidence related to Dr. Young's treatment of Plaintiff and the December 26, 2019 MRI records. The ALJ is directed to consider this additional evidence, as well as the entire record, to determine the persuasiveness of Dr. Osei's opinion and then to explain the consideration given to the supportability and consistency[21] factors bearing on that determination. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Court, however, notes that Dr. Osei's opinion as of July 1, 2019 does not necessarily establish that Plaintiff was disabled, but it certainly does not support the ALJ's RFC determination that Plaintiff was capable of light work, which, *inter alia*, "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *See* 20 C.F.R. §§ 404.1567(b), 416.967(b). This error, in turn, rendered the ALJ's step four determination that Plaintiff could perform his past relevant work as a "case aide" erroneous, and requires remand.

Two additional points are relevant on remand. It was improper for the ALJ to discount Dr. Osei's opinion based on Plaintiff's testimony that he *applied* to be a caseworker in 2019. (Tr. 17.) In doing so, the ALJ cherry-picked testimony to support her determination, while ignoring that Plaintiff testified that even if he had been offered the position he could not have done the job because "you have to do a lot of walking" and "go to home visits." (Tr. 63 (explaining that as a

---

[21] When evaluating consistency, the ALJ should specifically address the consistency between Dr. Osei's opinion and Dr. Trimba's opinion that Plaintiff "has mild to moderate limitation in his ability to stand and walk for a prolonged time" (Tr. 330). *See* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."); *Id.* § 416.920c(c)(2) (same). For the reasons explained herein, it was improper for the ALJ to discount that portion of Dr. Trimba's opinion based on her assessment that Plaintiff received only conservative treatment for his back pain and applied for a caseworker position in 2019.

caseworker he had to observe visits between children and "bad parents," and sometimes had to take children to and from their foster homes for such visits); *see also* Tr. 64 (explaining that he stopped working because his back pain "got to a point that [he could] no longer do anything").)[22] *See Noviello v. Comm'r of Soc. Sec.*, No. 18-CV-5779 (PKC), 2020 WL 353152, at \*6 (E.D.N.Y. Jan. 21, 2020) (collecting cases); *Beckers v. Colvin*, 38 F. Supp. 3d 362, 374–75 (W.D.N.Y. 2014) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination." (quoting *Sutherland v. Barnhart,* 322 F. Supp. 2d 282, 289 (E.D.N.Y.2004))).[23] Further, it was improper for the ALJ to discount Dr. Osei's opinion about Plaintiff's functional capacity, which was based primarily on limitations presented by pain in Plaintiff's back, neck, and shoulder, by citing Plaintiff's non-compliance with his restricted diet and diabetes medication. (Tr. 578–80.) Nothing in the treatment records nor in Dr. Osei's opinion suggests that Plaintiff's diabetes, whether treated or not, causes his musculoskeletal pain. Rather, Plaintiff's back pain stems from a car accident that occurred nearly 20 years ago. (Tr. 67–68.) On remand, the ALJ should not rely on these improper and irrelevant considerations in evaluating the persuasive value of Dr. Osei's opinion regarding Plaintiff's functional capacity in the workplace.

---

[22] At the same time, the ALJ is permitted to consider Plaintiff's daily activities, such as travel (Tr. 386) and walking his children to and from school (Tr. 70), in evaluating the intensity and persistence of his symptoms and reports of pain. *See* 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3). However, "[i]t is legal error to give *excessive* weight to a claimant's ability to perform basic daily activities when assessing his or her ability to engage in substantial gainful activity [because] [t]here are critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job." *Moss v. Colvin*, No. 13-CV-731 (GHW) (MHD), 2014 WL 4631884, at \*33 (S.D.N.Y. Sept. 16, 2014) (emphasis added) (citing, among others, *Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174 (ENV) (MDG), 2011 WL 1004696, at \*5 (E.D.N.Y. Mar. 18, 2011)).

[23] It was likewise improper for the ALJ to discount Dr. Trimba's opinion that Plaintiff would have "mild limitations in his ability to walk for a prolonged time" because Plaintiff applied for a job as a caseworker in 2019. (Tr. 15.)

**CONCLUSION**

For the reasons set forth herein, the Court denies the Commissioner's motion for judgment on the pleadings.  The Commissioner's decision is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Memorandum and Order.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2021
      Brooklyn, New York